**MAIN STREET MORTGAGE,
INC., Plaintiff,**

v.

**MAIN STREET BANCORP,
INC., Defendant.**

**No. 99–CV–6601.**

United States District Court,
E.D. Pennsylvania.

May 23, 2001.

---

Michael A. Smerconish, Beasley, Casey and Ebstein, Philadelphia, PA, Alan H. Bernstein, Caesar, Rivise, Bernstein, Cohen & Pokotilow, LTD, Philadelphia, PÀ, for Plaintiff.

### MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

Presently before this Court is Defendant's Motion in Limine to exclude the testimony of Kenneth Biddick. Biddick was designated by Plaintiff as an expert witness to testify at trial to support Plaintiff's claim for damages in this action for unfair competition and false designation of origin. We held Oral Argument in a hearing on this Motion in open court on April 18, 2001. At that time, both counsel agreed that we should decide the admissibility of Biddick's testimony on the record before us. Tr. of Oral Arg. at 2. For the reasons set forth below, the Motion is denied.

### BACKGROUND

Plaintiff brings this action under federal and state law for "service mark infringement, unfair competition, reverse confusion, palming off, and service mark dilution." *See* Pl.'s Mem. Opposing Def. Motion for Summary Judgment at 1. Defendant moved for Summary Judgment on October 26, 2000, which we denied in an order dated December 12, 2000, because we concluded that there were outstanding issues of material fact.

### DISCUSSION

We recognize that Plaintiff may not be entitled to any relief or that the recovery may be limited depending on the facts proved at trial. Assuming that the issue of damages arises at trial, Plaintiff is permitted to offer the testimony of Kenneth Biddick, consistent with this Memorandum.

### A. Standard of Review

 Federal Rule of Evidence 702, which governs the use of expert opinion testimony in the federal courts, has a liberal policy of admissibility. *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir.1997); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.2000). As amended effective December 1, 2000, Rule 702 reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The recent amendment to this rule essentially codifies the principles enunciated in the line of cases following *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* charges trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. 509 U.S. at 589, 113 S.Ct. 2786. District courts must ensure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence. *Id.* at 597, 113 S.Ct. 2786; *Elcock,* 233 F.3d at 744.

■ Courts undertake a flexible inquiry to determine: (1) whether the proposed witness is a qualified expert in the area in which he or she is being offered as an expert; (2) whether the proposed expert's testimony is reliable; and (3) whether the expert's testimony will assist the trier of fact. *Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741–43 (3d Cir.1994) (*"Paoli II"*), *quoting Daubert,* 509 U.S. at 595, 113 S.Ct. 2786.[1] These requirements are succinctly referred to as: qualifications, reliability, and fit. *Elcock,* 233 F.3d at 740; *In Re Unisys Sav. Plan Litig.,* 173 F.3d 145, 155 (3d Cir.1999). Plaintiff must establish these three things by a "preponderance of proof." *In Re TMI Litig.,* 193 F.3d 613, 663 (3d Cir.1999).

## B. Biddick's Proposed Opinion Testimony

Plaintiff retained Biddick to offer his opinion on Plaintiff's alleged damages as a result of Defendant's alleged unlawful conduct. In his report, Biddick summarized his opinions as follows:

(1) Based on Plaintiff's actual fee income prior to the alleged infringing activity and considering the overall market conditions during the alleged infringing activity, Plaintiff's gross fee income was below historical levels adjusted to market conditions.

(2) Plaintiff has potentially suffered lost profits for 1999 and 2000 of $33,083 and will continue to suffer lost profits into the future with a present value approximating $245,000.

(3) Defendant has provided a listing it represents as origination of mortgages during the alleged infringing period within the most common markets of both Defendant and Plaintiff. Defendant has not identified by any means any allocation of these amounts or costs of producing these sales. Defendant's sales (interest income and net interest margin) cannot be allocated to potentially separate any non-infringing activity based on information provided. Defendant's total interest earnings from all of its mortgages in the five-county Philadelphia area during the alleged infringing period was $12,182,300, and $8,177,500, respectively. Assuming a stock value between the historic high and low these values would be approximately $16,000,000 and $12,700,000, respectively.

(4) Plaintiff will not be able to continue to operate the financial service activity of mortgage services using the same

---

**1.** We recognize that both *Paoli II* and *Daubert* concern scientific evidence. The Third Circuit has drawn distinctions between determining the admissibility of scientific evidence under 702 and evaluating financial testimony under the same rule. *See In re Unisys Sav. Plan Litig.,* 173 F.3d 145, 157 (3d Cir.1999). In the *Unisys* case, the court held that the proposed testimony concerning investigation methods for determining financial health should not be evaluated "by the particular standards required for testimony based on a particular scientific ethic." *Id.* Rather than use of all of the factors suggested by *Paoli II,* the Third Circuit examined whether the proposed expert was qualified; whether his methods were reliable; and whether the proposed testimony fit the case. *Id.* at 155–157.

core name Main Street, and will be precluded from any business expansion in any of its available markets. Plaintiff's business value will be forever damaged and possibly destroyed. Plaintiff's business value prior to the alleged infringing activity ranges approximately between $594,000 and $671,000.

Defendant's Exhibit A, "Biddick Report" at 3.

Defendant challenges this proposed testimony on two grounds. First, Defendant complains about Biddick's lack of experience performing analyses in the mortgage industry. Second, Defendant challenges some of the methodology he employs to reach the conclusions contained in the report.

## C. Rule 702 Analysis

### 1. Qualifications

■ A witness who offers to testify about specialized knowledge must be an expert. *Paoli II*, 35 F.3d at 741. The Third Circuit has interpreted this requirement liberally. *Id.; In re TMI*, 193 F.3d at 665 n. 89. The proposed witness does not have to be the best qualified or possess the most appropriate qualifications. *Paoli II*, 35 F.3d at 741. However, "the level of expertise may affect the reliability of the expert's opinion." *Id.*

Biddick is a Certified Public Accountant (CPA) with twenty-one years of experience in the profession. Biddick Report Exhibit C ("Curriculum Vitae"). For ten years, he worked as an auditor or audit manager with various accounting firms. *Id.* In 1989, he became a director at Ernst and Young. *Id.* In 1993, he formed his own consulting company, and for the past sixteen years he has worked as a consultant in dispute resolutions. Pl.'s Mem. at 3. Biddick has been qualified as an expert in several jurisdictions, including the Eastern District of Pennsylvania. *Id.* While he does have extensive general accounting experience, this dispute represents the first time that he has worked on a case concerning the mortgage or home loan industry. *Id.*

■ We find that Biddick, although not specialized in the mortgage industry, is sufficiently qualified to make the damages estimate contained in his report. Biddick is an experienced public accountant who has conducted valuations of various businesses and previously performed analysis similar to that done here. Tr. of Oral Arg. at 17–18. He discussed the mortgage industry with Walter S. Smerconish, the President of Main Street Mortgage. *Id.* He also examined the historical performance of mortgages in the three dominant counties in the Philadelphia area: Bucks, Chester, and Montgomery. *Id.*

Were he being offered as an expert as to the inner workings of the mortgage industry, we might conclude that he lacked the proper qualifications. However, as Plaintiff's counsel articulated at Oral Argument, Biddick is not testifying as a trademark expert or saying that the decline in Plaintiff's business is attributable to the Defendant's allegedly infringing conduct. *Id.* at 28. He is being offered to quantify the decline. *Id.* at 28. Biddick's proposed testimony concerns the area of damages, and we find that his background as a CPA and experience in analyzing financial data are sufficient to qualify him to testify on lost profits.

### 2. Reliability

■ The standard for determining reliability "is not that high." *In re TMI*, 193 F.3d at 665, *quoting, Paoli II*, at 35 F.3d at 745. The main goal is to exclude so-called "junk science" and ensure that expert testimony is based on sound methods and valid procedures. *Lentz v. Mason*, 32

F.Supp.2d 733, 745 (D.N.J.1999), *citing* 4 Weinstein's Evidence Section § 702.05[3]. Plaintiff is not required to prove its case twice. *In re TMI*, 193 F.3d at 665. By this we mean that, Plaintiff does not have to demonstrate to us, by a preponderance of the evidence, that its assessment of the expert is correct. *Id.* Plaintiff only has to show that the expert's opinion is reliable. *Id.*

■ If the proposed opinions and conclusions are based on "good grounds" then the expert testimony is reliable. *Paoli II*, 35 F.3d at 748. To determine whether good grounds are present, we must examine the expert's conclusions to see: "whether they could reliably flow from the facts known to the expert and methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir.1999). The focus is on the reliability of the methodology as opposed to the merits of the conclusions drawn. *See Paoli II*, 35 F.3d at 742; *In Re TMI*, 193 F.3d at 664. Plaintiff does not have to demonstrate that the grounds for its expert's opinion are perfect. *Paoli II*, 35 F.3d at 744; *In Re TMI*, 193 F.3d at 665. An expert's opinion may still be based on "good grounds" even if we think that there are better grounds for some alternative conclusion. *Id.* at 665. Indeed, there may be good grounds for an opinion despite the fact that the expert's methodology has some flaws such that if they had been corrected, he may have reached a different result. *Id.* Evidence cannot be excluded if the sole basis for doing so is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. *Id.* The Third Circuit has instructed that we should exclude evidence only if the flaws are significant enough that the expert lacks "good grounds" for his or her conclusion. *Id.*

■ Biddick attempted to quantify Plaintiff's total damages. First, he looked at Plaintiff's earnings before the alleged infringing event. He attempted to calculate the difference between what Plaintiff's earnings would have been had the Defendant not engaged in the allegedly inappropriate conduct and Plaintiff's actual earnings, from 1998 to 2000. He then projected what Plaintiff's earnings would have been after December 31, 2000, absent the challenged conduct. Since Plaintiff may be entitled to Defendant's profits, Biddick also calculated these.

Defendant has not challenged the data used by Biddick in forming his opinions.[2] Instead, Defendant attacks the reliability of the proposed testimony on the grounds that it contains several errors and omissions.

(a) Plaintiff's Lost Profits From 1998–2000

To quantify Plaintiff's lost profits from 1998 to 2000, Biddick first analyzed Plaintiff's financial performance prior to start of Defendant's allegedly infringing behavior. Biddick Report at 3–4. He then calculated three possible revenue amounts, each based on different assumptions. *Id.* In the first, he took the average fee income for the two years prior to the infringing behavior and then assumed that the fee income would have remained constant into the future absent any actions on the part of the Defendant. *Id.* at 4. In the second, he assumed that the 1999 and 2000 fees would increase at the cumulative rate of change experienced from 1995 to 1998. *Id.* In the third scenario, Biddick assumed that Plaintiff's gross fees in 1999 and 2000 would reflect the changes in the mortgage markets in Bucks, Montgomery, and Ches-

**2.** Mr. Biddick testified at his deposition that he used data supplied by both Plaintiff and

Defendant. Pl.'s Mem. at 7–8 *quoting* Biddick Dep. at 24–26.

ter counties, the three dominant counties in the 5–county Philadelphia region at issue in this case. Biddick Report at 4; Biddick Dep. at 109. From each of these fee projections, Biddick subtracted the actual fee income for 1999 and 2000, to get what he refers to as "lost gross fees." *Id.* From this amount, he subtracted Plaintiff's incremental cost of business, which he reasoned was limited to processing fees and commissions. *Id.* Biddick then computed the average of the three net fee computations to determine possible lost profits in 1999 and 2000.[3] *Id.*

Defendant argues that Biddick's lost profit calculation does not quantify the amount of net profits Plaintiff would have earned on mortgages originated by Defendant as result of Defendant's use of the name "Main Street Bancorp Mortgage." Def.Mem. at 10. Defendant does not provide the method by which Biddick should have calculated net profits. Defendant specifically criticizes the lost profit calculation on the grounds that each of the three scenario's represent "possibilities" and that Biddick made unreasonable assumptions. Def.Mem. at 24. In the first scenario, Biddick assumed that Plaintiff's business would have continued to grow consistent with its historical trend. As to the second scenario, Defendant contends that Biddick's calculation was skewed upwards. Def.Mem. at 25–26. Biddick took the average rate of growth from 1995 to 1998, to determine the cumulative rate of change. *Id.* The 1995 figures were not used to calculate the average historical fees in the first scenario. *Id.* Defendant argues that the 1995 figures were not used to calculate the historical fees because this lower number would have reduced the average fee amount. *Id.* As to the third

scenario, Defendant argues that Biddick's comparison is unreliable because he did not examine whether Plaintiff's business had mirrored what occurred in these three counties prior to 1998. Biddick Dep. at 114.

We find that Biddick's methodology is sufficiently reliable to be admissible under Rule 702. *See In re TMI,* 193 F.3d at 665. Lost profits are not as easy to quantify as actual out of pocket losses. Such calculations require one to make a few assumptions. This does not render all such calculations unreliable. The admissibility test does not turn on whether the opinion has the best foundation or whether it is supported by the best methodology, or unassailable research. *In re TMI,* 193 F.3d at 665. The test is whether the "particular opinion is based on valid reasoning and reliable methodology." *Kannankeril,* 128 F.3d at 806. Biddick had to make some assumptions and he looked at various possibilities. The fact that other methods for calculating lost profits in this type of case may produce different results, does not undermine Biddick's analysis. *See In re TMI,* 193 F.3d at 665. Whether the decline in Plaintiff's profits is attributable to the Defendant or some other factors is a factual question, not an issue of reliability. *Id.* We are confident in the jury's ability to assess this evidence. *Id.*

Defendant also pointed out what may be a mathematical error in this first scenario. Def.Mem. at 25. Biddick's report states that he added the gross fees for 1996, 1997, and 1998, and then calculated the average for these three years. Biddick Report at 4 and Exhibit A. The Report concludes that this average was $118,603. *Id.* Based on the face of the report, it appears that the average should be

---

**3.** He did not determine any lost profits for 1998 because of personnel changes and the fact that possible confusion between Plaintiff

and Defendant would not begin until late in the fourth quarter of 1998. Biddick Report at 4.

$116,018.[4] *See id.;* Def.Mem. at 25. We defer our final decision as to the admissibility of this figure until the time of trial. At which time the expert can explain or correct this figure. If it is an error, it appears that it will bear only the weight, rather than sufficiency of the evidence.

### (b) Plaintiff's Lost Future Profits

Biddick next sought to quantify Plaintiff's lost future profits. Biddick Dep. at 133. He first assumed that Plaintiff would suffer a continual level of damage into the future. Biddick Report at 4; Biddick Dep. at 133. He attempted to value this loss stream by multiplying his average estimated loss profit figure for the year 2000, $19,122, by a capitalization rate of 13. *Id.* This capitalization rate is the industry average price/earnings ratio for public companies in financial services with a core mortgage origination business. *Id.* From this calculation, Biddick concludes that Plaintiff's lost future profits are $248,583.[5]

Defendant challenges this method of calculating lost future profits. Def.'s Mem. at 29–32. First, as discussed above, Defendant objects to the Biddick's lost profit amount for the year 2000. *Id.* at 30. Second, Defendant contends that there is not a sufficient basis for Biddick's assumption that the amount of lost profit would continue indefinitely into the future. *Id.* Third, Defendant objects to Biddick's use of 13 as the capitalization rate. *Id.* at 31. Defendant points out that this is the rate for publicly traded companies and that Plaintiff is a small, closely held corporation. *Id.*

We find that, although calculating the net present value of losses projected into the future is the more common method of determining lost future profits,[6] Biddick's methodology is acceptable and reliable. It is not so far afield as to render it junk science. *See In re TMI*, 193 F.3d at 665. As to the selection of 13 for a capitalization rate, this does not destroy the reliability of Biddick's opinions. There is no standard capitalization rate for companies like Plaintiff's. Biddick attempted to analogize Main Street Mortgage to publicly traded companies in the same business sector. Such an analogy may not be perfect, but it is sufficiently reliable to be admissible under Rule 702. *See Paoli II*, 35 F.3d at 742; *In Re TMI*, 193 F.3d at 665. Defendant is free to challenge Biddick's method for calculating lost profits through cross examination and retaining its own damages expert. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

### (c) Defendant's Profits

Biddick also calculated Defendant's interest income generated from mortgage loans in the five-county Philadelphia area serviced by both Plaintiff and Defendant for the years 1998, 1999, and 2000. Biddick Dep. at 166–67. To do this, he took the average rate earned by the Defendant on the loan pools it originated each year and applied that average rate to outstanding loan values to calculate the interest

---

**4.** $121,590 + $106,914 + $119,550 = $348,054 ÷ 3 = $116,018. We could not tell from the report how Biddick concluded that the average was $118,603. There may be a rational explanation for his calculation. Plaintiff did not address this discrepancy in its Memorandum or at Oral Argument.

**5.** By our calculation, $19,122 × 13 = $248,586. According to the Biddick's report, it is $248,583. While this $3 discrepancy is of some concern, it does not so undermine Biddick's conclusions as to make them inadmissible.

**6.** At his deposition, Biddick acknowledged that lost future profits are generally calculated by reducing the estimated future losses to a present value. Biddick Dep. at 134.

Defendant earned on those loans. Biddick Report at 6–7. This interest calculation is adjusted to reflect the number of months a loan was outstanding in its origination year. Biddick Dep. at 166–67. He then calculated the interest earned on all of Defendant's loans for each successive year using the same average rate as the year of the loan's origination. Biddick Dep. at 178–180, 230–231. Biddick then added together all of the interest generated on these loans through 2000. *Id.* at 180.

In his report, Biddick admitted that he did not have sufficient information to determine the precise interest income on Defendant's mortgage loans resulting from the allegedly infringing behavior. *Id.* at 212; Biddick Report at 5. The report states that the calculations represent the Defendant's gross profit from mortgage loan origination. Biddick Report at 5. We recognize that Biddick's ability to determine the interest income was constrained by the information supplied by the Defendant. *See Paoli II,* 35 F.3d at 744. Biddick is not being offered as a trademark expert to testify as to which mortgage loans resulted from Defendant's infringing conduct. *See* Tr. of Oral Arg. at 28. His opinion is that should a jury conclude that all the mortgage loans originating from 1998 to 2000 were the result of trademark infringement, this is the amount of profit realized by the Defendant. *Id.* A jury may determine that none of the mortgage loans originating in this time frame were the result of wrongful conduct on the part of the Defendant. If that occurs, the jury will be free to disregard Biddick's opinion. *See In re TMI,* 193 F.3d at 665.

### (d) Defendant's Future Income From Loans Originating from 1998–2000

Profits from mortgage loans begin in the year of their origination and continue into the future until the loan is paid off or sold.

Biddick Report at 6. Biddick attempted to calculate the present value of the interest income generated by loans originating from 1998 to 2000. *Id.* Biddick reasoned that the market's valuation of the company would provide an accurate assessment of the present value of this income stream. *Id.;* Biddick Dep. at 181.

Biddick first computed the total capitalized value of the Defendant corporation based on the total number of shares outstanding and the market price per share on October 26, 2000. *Id.* He then divided this result by Defendant's total interest revenues. *Id.* According to Biddick, this calculation results in a capitalized value of 62.14%. Biddick Report, Ex. B; Biddick Dep. at 181. He then multiplied 62.14% by the interest revenue generated in 2000. *Id.* Biddick argues that this calculation represents the value that the market has placed on the stream of income from the mortgage loans, as of October 26, 2000. *Id.*

Biddick admitted that the Defendant's stock price is affected by things other than the Bank's ability to generate interest income. Biddick Dep. at 183–184. Thus, it is not a perfect indicator of the net present value of Defendant's future income from mortgage loans originating from 1998 to 2000. *Id.* Biddick also acknowledged that he was not aware of anyone else determining a capitalization rate based on only a segment of a company's revenues. *Id.* at 193. Still, he reasoned that this calculation accurately reflected the present value of Defendant's future income from the mortgages originating from 1998 to 2000, because interest income is at the core of Defendant's business and other revenue streams were minimal. *Id.* at 197, 200.

Whether there is reliable evidence that the capitalization factor accurately measures the value for a specific business is a factual issue, not one of reliability. *See*

*Moyer v. United Dominion Indus., Inc.,* No. Civ. A. 97–5569, 2000 WL 1230253, at *2 (E.D.Pa. Aug.17, 2000) (unorthodox manner in which expert performed tests and studies did not preclude admission of his testimony).[7] Biddick's opinion as to Defendant's future income is based on sufficiently "good grounds" so as to be reliable. *See Paoli II,* 35 F.3d at 748. Biddick's conclusions may not be above reproach, but this does not render them inadmissible. *Id.; In Re TMI,* 193 F.3d at 665 (the reliability test is "lower than the merits standard of correctness."). As the Supreme Court noted in *Daubert,* "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 588–89, 113 S.Ct. 2786.

### (e) Purchase of Business

Biddick calculated the value of Plaintiff's business prior to the alleged infringing activity. Defendant protests that there is no reason that Plaintiff cannot continue its mortgage business into the future, in at least some form.[8] Def.Mem. at 38–39. Additionally, Defendant challenges the result reached by Biddick on the ground that it "suffers from the same flaws as his previous damage calculations." *Id.* at 39. In particular, Defendant attacks the capitalization rate utilized to value Plaintiff's business. *Id.*

We find that these arguments, while being legitimate points for cross examination, do not render Biddick's valuation determination so unreliable as not to be helpful to the trier of fact. *See Daubert,* 509 U.S. at

588–89, 113 S.Ct. 2786. Biddick is not being offered to testify that Plaintiff is in fact entitled to full value of its business. Tr. of Oral Arg. at 28. His report only offers an opinion of the value of business should it turn out that Plaintiff is entitled to such a sum. *Id.* Since Biddick's methodology is sufficiently reliable, it is the jury's role to assess Biddick's conclusions. *In Re TMI,* 193 F.3d at 665.

### 3. Fit

There must be a valid connection between the expertise in question and the inquiry being made in the case. *Id.* at 670; *Paoli II,* 35 F.3d at 743. Defendant does not attack the relevance of Biddick's testimony to the facts of this case. We find Biddick's proposed testimony will assist the jury in determining the amount of damages, if any, that the Plaintiff is entitled to as a consequence of Defendant's actions.

In discussing the fit requirement, Defendant also addresses the merits of Plaintiff's claim at length. We decline to re-examine the merits of this action at this point. Our December 12, 2000 Order denied summary judgment on the basis that outstanding issues of material fact existed. We continue to adhere to this determination.

### CONCLUSION

After review of Biddick's proposed testimony and expert report, we are satisfied that it is sufficiently reliable to be admissible. The fact that a different accountant could have reached conclusions more favorable to the Defendant does not render

---

**7.** *See also Reference Manual on Scientific Evidence,* 2nd Ed.2000, discussing the use of a capitalization factors to discount a stream of future losses.

**8.** Defendant also argued that Biddick was unqualified to undertake such an analysis of a mortgage business. As discussed above, we disagree and find that Biddick has sufficient qualifications to render an opinion on value of Plaintiff's business.

Biddick's opinions inadmissible under Rule 702. *See In re TMI*, 193 F.3d at 665. The Third Circuit has cautioned against applying the reliability requirement too strictly, explaining that it cannot be used "as a tool by which the court excludes all questionably reliable evidence." *Paoli II*, 35 F.3d at 742. Moreover, the Federal Rules of Evidence embody a preference for admitting evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process. *See Daubert*, 509 U.S. at 588–89, 113 S.Ct. 2786; *Kannankeril*, 128 F.3d at 808. We find that although the analysis did make some assumptions that concern us, they are sufficiently straightforward that the proper remedy is cross-examination, rather than wholesale exclusion. *See id.; Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*, Civ. A. No. 95–1376, 1998 WL 151806 (E.D.Pa. Apr.1, 1998).

Finally, it has been brought to our attention that Plaintiff's Response to this Motion was filed under seal on March 20, 2001. No leave of court was obtained to make this filing under seal. After review of the materials, we see no reason that this filing should remain under seal.

### ORDER

AND NOW, this 22nd day of May 2001, upon consideration of Defendant's Motion in Limine, filed February 23, 2001, Plaintiff's Response, filed on March 20, 2001, Defendant's Reply, filed on April 3, 2001, and Oral Argument held on April 18, 2001, consistent with the foregoing Memorandum, IT IS HEREBY ORDERED that the Motion is DENIED. IT IS FURTHER ORDERED that the Plaintiff's Response filed under seal on March 20, 2001 is hereby UNSEALED.